On May 2d 1930, Samuel I. Kessler was appointed receiver of the defendant company. On June 6th, on its own petition, the company was adjudged a bankrupt by the federal court in New York and on August 14th the Irving Trust Company was appointed trustee. The receiver has filed his account, asks its approval, the fixing of his compensation and that of his counsel and direction to pay the residue to the trustee. On June 15th, 1931, the federal court (a referee) ordered the receiver individually to file his account in that court together with a verified statement of his services and expenses as receiver to the date of the adjudication and that he forthwith turn over the estate in his hands to the trustee. New York counsel of the trustee, who was also the attorney of the petitioner in bankruptcy, appeared on this motion, pro hac vice, and, presuming to appear specially, objected to the court making allowances, claiming that the jurisdiction resides in *Page 418 
the federal court. A compliance with the order of the federal court by our receiver without the consent of this court would be contempt of this court. A more orderly and courteous procedure would have been to have applied to this court for directions to its receiver; and, according to the authorities, that is the exclusive course. The course adopted by counsel for the trustee is unwarranted and his statement in court that a non-compliance with the order of the referee might result in our receiver landing in jail is offensive The federal court may well be depended upon to restrain such threatened abuse of power. The practice as laid down in Shachat v. Standard Auto Supply Co.,106 N.J. Eq. 105, is that indicated In re Watts Sachs,190 U.S. 1, which has ever since been the guide of courts and lawyers in this state, that the court of primary jurisdiction may supervise the administration of its receivers and fix their compensation, and it will be adhered to. The recent case ofIsaacs v. Hobbs Tie Timber Co., 282 U.S. 734, cited by the trustee, does not touch that question. That was a foreclosure of mortgage suit brought after a trustee was appointed and the court held it to be not maintainable; that as the mortgaged property was in the hands of the bankruptcy court, the right to a lien and its enforcement could only be handled in that court. The opinion deals with the title to bankrupt's property and not with the orderly judicial administration of bankrupt's assets, and restates the familiar rule that obtains in all courts of equity, and upholds the authority of this court as the court of original jurisdiction to dispose of property in its custody according to law; "* * * when a court of competent jurisdiction takes possession of property through its officers, this withdraws the property from the jurisdiction of all other courts which, though of concurrent jurisdiction, may not disturb that possession; and that the court originally acquiring jurisdiction is competent to hear and determine all questions respecting title, possession and control of the property." This is a plain recognition of the power of this court to control the disposition of property incustodia legis and that right must be accorded by the bankruptcy court *Page 419 
until this court has set its house in order. The principles of comity in judicial conduct are informatively discussed by Mr. Justice Moody in Wabash Railroad Co. v. Adelbert College,208 U.S. 38. The duty of this court under our Corporation act was to administer the estate while in its possession and its duty now is to pass the assets over to the federal court, whose jurisdiction has superseded ours under the Bankruptcy act, after liquidating the expenses attending its administration in this court. This makes for convenient and orderly conduct of administration between successive jurisdictions, and is supported by the weight of authority and has been followed by both state and federal courts as the appropriate course since In re Watts Sachs.
The receiver has been functioning for more than a year. The delay in the demand by the trustee was due to the receiver resisting the adjudication in bankruptcy by direction of this court, and for this reason: The corporation and two of its affiliates, the Bankstocks of Maryland and the Journal Square of Delaware, shortly before the appointment of the receiver had been taken over by a group of promoters of fake stock, with the single purpose of looting them, and they had partly succeeded when receivers were appointed for the three companies. The unscrupulous group, though under the ban of an injunction of this court, instituted the bankruptcy proceedings, hopeful in some way to circumvent the receivers who had thwarted them and who continued under the court's direction to resist them until the final ruling by the circuit court of appeals. The former management of the allied companies had sold their holdings, and, it is claimed by the receivers, turned the assets of the companies over to the group of swindlers who used them to obtain the means to pay the purchase price, and a suit is now pending to compel them to account. It is but truth to say that, but for the timely appointment of the receivers and their joint activities in recapturing securities, there would now be nothing at all for the already heavily mulcted stockholders. Valuable securities, running into stupendous sums, had been pledged by the old and the new managements, and, in imminent danger of being *Page 420 
sold and the equities lost, were redeemed by the receivers upon credit obtained by them from banks and the equities saved, and this during the financial depression of 1930. Their task was arduous and attended with grave responsibilities. The work of salvaging, financing and reselling of securities called for painstaking research into values, diligence and judgment of a high order to insure advantageous figures, and restraint in selling in a downward market was even more trying. Most of the beneficial results, in money's worth, the salvaging, were obtained before the trustee was appointed. Since then, the receiver has been occupied in conserving the assets, supporting and sustaining the securities, in some instances by outlays authorized by the courts, and seeking markets for them but refusing sacrificial offers under the direction of the court upon the urgent request of a vast majority of stockholders and the parties interested. This policy of holding on has to now resulted in loss, due to lowering values of the securities, but in the judgment of the court, if continued, will eventually be profitable. The manual services of the receiver may be found in his report; the beneficial results of his labor cannot be recorded; they must be estimated and appraised. He is to be commended and compensated for both. The receiver had counsel who was quite as unsparing of his time and services in his department, in his pursuit of the misapplied funds, their recovery and the bringing of the wrongdoers to account.
The receiver will be allowed $10,000. Counsel to the receiver $7,500. The receiver's accounts will be approved and he will be allowed, as a disbursement, $3,000 for New York counsel and the charge of his accountant. One acccountant was ordered by the court for the three companies because of the inter-manipulations of the accounts and securities of the three companies by the single-headed management. A fair proportion of the expenses is to be allocated to each or if the charges can be segregated, then the actual cost. The receivers will make the adjustment or submit it to the court for solution. *Page 421